IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DAMIAN M. BATEAST,

      Plaintiff,

v.            CASE NO. 22-3093-JWL

OLUWATOSIN S. ORUNSOLU, et al.,

      Defendants.

## MEMORANDUM AND ORDER
## TO SHOW CAUSE

Plaintiff brings this pro se action under 42 U.S.C. § 1983. The Court granted Plaintiff leave to proceed in forma pauperis. Although Plaintiff is currently an inmate at the Lansing Correctional Facility in Lansing, Kansas, his claims arose during his detention at the El Dorado Correctional Facility ("EDCF") in El Dorado, Kansas. On June 10, 2022, the Court entered a Memorandum and Order and Order to Show Cause (Doc. 5) ("MOSC") granting Plaintiff an opportunity to show cause why his Complaint should not be dismissed or to file an amended complaint to cure the deficiencies set forth in the MOSC. In response, Plaintiff filed an Amended Complaint (Doc. 6) ("AC"). The Court conducted an initial screening of Plaintiff's AC and entered a Memorandum and Order (Doc. 8) ("M&O") directing the officials responsible for the operation of the EDCF to prepare a *Martinez* Report. The M&O provides that "[o]nce the report has been received, the Court can properly screen Plaintiff's claims under 28 U.S.C. § 1915A." (Doc. 8, at 2.) The *Martinez* Report (Docs. 22, 25, 26) has now been filed, and the Court will screen the Amended Complaint in light of the Report. The Court's screening standards are set forth in the Court's MOSC.

1

**I. Nature of the Matter Before the Court**

Plaintiff brings three counts in his AC. All three are based on an incident that occurred on June 26, 2020. Plaintiff alleges that he was housed in Restrictive Housing at EDCF under protective custody ("PC") for his safety. He was assigned a cellmate, Inmate Austin, who was in Restrictive Housing for disciplinary reasons and was well known for violence against his cellmates. Plaintiff was being taken to the showers and his hands had just been cuffed behind his back by Corrections Officer Brandon Gaines when Austin attacked him. Plaintiff alleges that Gaines held onto the chain between the cuffs for some period of time as Austin approached and began to strike him. Austin hit him in the face and head multiple times with a contraband combination lock. Plaintiff suffered serious injuries, including a fractured eye socket. Plaintiff had to be supported by two officers as he was taken to the facility's medical clinic, being unable to walk on his own. There, he was examined by Nurse Rochelle Graham. She merely cleaned a wound on his elbow despite Plaintiff having a tennis ball-sized knot on his forehead, a black eye that was swollen closed, and having to be held upright on the examination table due to extreme dizziness. Plaintiff was placed in an isolated suicide watch cell in the infirmary. The cell did not have an emergency call button. Plaintiff experienced dizziness, pain, and repeatedly vomited throughout the night. To get the attention of the nurse and officer working the infirmary, Plaintiff had to beat on the window. The nurse, whom Plaintiff refers to as Jane Doe, eventually gave Plaintiff two tablets of ibuprofen and five Prednisone tablets. The next day at about 3:00 p.m., Plaintiff was transported to the hospital by Corrections Officers Gannon and Freeman. There, the treating doctor determined he had suffered a concussion and x-rays revealed his facial injuries. The doctor prescribed pain medication for Plaintiff. He was rushed out of the hospital against

medical orders by Gannon and Freeman with an IV still in his arm.  When he reached EDCF, he was returned to the cellhouse rather than the infirmary, which was also against the doctor's orders.  This resulted in Plaintiff not receiving the pain medication prescribed at the hospital because EDCF does not allow narcotics outside of the infirmary.

In Count I, Plaintiff alleges Defendants Orunsolu, Knapp, and Martin violated his rights under the Eighth Amendment by failing to provide him with proper protection from inmate assault while in protective custody.  Plaintiff argues that EDCF policy should not allow inmates who are in protective custody to escape potential attack by other inmates to be double-celled with inmates who are in Restrictive Housing for punitive purposes (classified as Other Security Risk or "OSR").  He claims he has been attacked and injured multiple times by OSR inmates because of his PC status, which Orunsolu exposed to the other inmates in Restrictive Housing in an attempt to force Plaintiff to sign a "PC waiver" so Plaintiff could be returned to the general population.  Plaintiff states that he repeatedly asked to be housed alone, but his requests were denied.  Plaintiff further alleges that Defendant Knapp engaged in a heated discussion with Austin on June 26, 2020, before the attack.  Austin wanted to get out of Restrictive Housing, and Knapp said for that to happen, "an event has to happen."  Plaintiff asserts that Knapp was referring to Austin attacking Plaintiff, which shows Knapp was aware of and even condoned Austin's actions.

In Count II, Plaintiff again alleges failure to protect under the Eighth Amendment, this time naming Defendants Flores, Latham, Gaines, and Perez.  Gaines and Perez were the officers present for the assault.  Flores and Latham had moved Plaintiff and Austin to a new cell the morning before the assault occurred.  Austin wanted to bring his mattress from the old cell, and at first the officers refused.  Austin then called Flores to the door of the cell and whispered something to her.  She left

3

and returned with the mattress. This was the mattress where Austin was hiding the padlock he later used in the assault on Plaintiff. Plaintiff alleges Flores and Latham acted with malice.

In Count III, Plaintiff alleges that Defendants Graham, Gannon, Freeman, Harrod, Jane Doe, and John Doe were deliberately indifferent to his serious medical needs under the Eighth Amendment. He claims Graham failed to conduct an adequate examination of Plaintiff after the assault, that he should not have been put in an isolated cell and ignored, and that he did not receive the medication prescribed by the doctor at the hospital.

Plaintiff names as defendants the following EDCF personnel: Oluwatosin Orunsolu, CCI Unit Team; Adam Knapp, CCI Unit Team; Malty Martin, Unit Team Manager; Dana Flores, Corrections Officer; Asbury Latham, Corrections Officer; Brandon Gaines, Corrections Officer; Orlando Perez, Corrections Officer; Rochelle Graham, Nurse; Eric Freeman, Corrections Officer; FNU Gannon, Corrections Officer; Jane Doe, Nurse; John Doe, Corrections Officer; John Doe #2, Medical Provider; and the El Dorado Correctional Facility.[1] Plaintiff seeks compensatory damages, punitive damages, and injunctive relief.

## II. The *Martinez* Report

The Report alleges that Plaintiff has not exhausted his administrative remedies and disagrees with Plaintiff's description of events in several regards.

First, the Report alleges that while Plaintiff attempted to grieve some of the issues raised in the AC, he failed to follow grievance procedures. This resulted in the following letter dated August 31, 2020, from Douglas Burris to Plaintiff:

> I am writing to you in response to your grievance report form that we received. K.A.R. 44-15-102 requires an inmate to file a formal grievance with the principal administrator of the facility before appealing to the Secretary. The content of your grievance form reflects no evidence that you filed your grievance with the facility

---

[1] Plaintiff's claims against EDCF were previously dismissed by the Court. (*See* M&O, Doc. 8, at 4).

>principal administrator before pursuing an appeal with the Secretary. In accordance with K.A.R. 44-15-102 (c)(4), we are forwarding your grievance to the warden of the correctional facility where you are housed. If you have further questions regarding this matter, we suggest that you contact your unit team.

Doc. 22-1, at 5.

According to the Report, Plaintiff did not take any further action on this grievance.

Next, the Report states that three of the named defendants had no involvement in any of the allegations in the AC. According to the Report, Brandon Gaines was not employed at EDCF on June 26, 2020; Coy Gannon did not escort Plaintiff to the hospital on June 27, 2020, or any other day; and Malty Martin did not interact with Plaintiff on or around June 26, 2020, because Martin was the UTM in C-Cellhouse and Plaintiff resided in A-Cellhouse.

As for Plaintiff's allegations in Count I, the Report states that Plaintiff frequently asked to be single-celled but that the Restricted Housing Unit ("RHU") at EDCF did not have enough cells to provide each resident their own cell. Plaintiff and Austin were housed together starting on June 18, 2020. Defendant Orunsolu states that neither Plaintiff nor Austin expressed fear of the other during the short time they were together prior to Austin's attack. Defendant Knapp states that KDOC records showed no reason that Austin and Plaintiff could not be roomed together and that neither Austin nor Plaintiff stated verbally or in writing that they could not or would not room with the other. Knapp denies Plaintiff's account of a conversation between him and Austin where he implied Austin had to attack Plaintiff to be released from RHU. Knapp points out that Austin was not released from RHU after the attack and in fact remained in RHU until released from KDOC custody on March 25, 2021. *Declaration of Adam Knapp*, Doc. 22-1, at 56-57.

The Report also disputes Plaintiff's allegations in Count II, stating that there is no evidence that a padlock or any weapon was used by Austin in his attack on Plaintiff. Defendants Flores, Lathrom, and Perez deny any knowledge of Austin having a padlock.

Finally, the Report disagrees with Plaintiff's allegations in Count III. According to Plaintiff's medical records, he was assessed on June 26, 2020, at 6:40 p.m. after the attack. He had a "[l]arge area above left eye . . . swollen out like a 'goose egg'" and his eye was swollen half shut. Doc. 26, at 2. The swollen area was measured and recorded as 6 x 4 cm. The records indicate Plaintiff reported a pain level of 8 out of 10. Nurse Grahem noted that Plaintiff believed that he had lost consciousness. *Id*. at 9. Plaintiff was given an ice pack. About two and half hours later, Plaintiff was given another ice pack and 600 mg of ibuprofen for pain. At midnight, Plaintiff was resting quietly in the infirmary. At 3:00 a.m., Plaintiff still had swelling and was given another 600 mg of ibuprofen. The nurse on duty noted that Plaintiff needed to see the rounding provider "today" to assess his eye.

Plaintiff was also assessed by a behavioral health practitioner immediately after the attack. *See id*. at 15 - 25.

At 12:54 p.m. on June 27, 2020, Nurse Leiber noted continued swelling, with Plaintiff unable to open his left eye, and that Plaintiff reported nausea, headache, and a pain level of 5 out of 10. *Id*. at 27. She discussed Plaintiff with Dr. Harrod, and he ordered that Plaintiff be sent to the hospital.

Plaintiff left the EDCF infirmary to go to the hospital at 2:00 p.m. He returned from the hospital to the EDCF infirmary at 8:30 p.m. with a diagnosis of orbital wall fracture. He was assessed by Nurse Milsap upon return to EDCF, and she did not observe any additional injuries. *Id*. at 42. There is no mention in the records of Plaintiff being removed from the hospital against

medical orders. The maxillofacial surgeon at the hospital, Dr. Tingey, prescribed a narcotic and a steroid and ordered that Plaintiff should keep his head elevated. Nurse Milsap gave Plaintiff a second pillow and called Dr. Harrod to substitute a narcotic and steroid that they had available at EDCF. At 3:00 a.m., Plaintiff was given his first dose of Prednisone. At 5:00 a.m., Plaintiff was resting in bed with his head elevated and without signs or symptoms of distress.

Plaintiff received pain medication at 9:30 a.m. on June 28, along with extra blankets to further elevate the head of the bed. Plaintiff declined his pain medication at 4:04 p.m. but accepted an ice pack. He asked to be awakened for nursing rounds so he did not have to bang on the door when he needs something. *Id*. at 47. When Plaintiff reported the pain medication made him nauseous, Dr. Harrod issued a new order for Tylenol 650 mg instead. Plaintiff was also presribed medication for the nausea, an antibiotic, and eye drops. *Id*. at 49, 52.

On June 29, 2020, Dr. Harrod saw Plaintiff. Plaintiff was dismissed from the infirmary in stable condition at 12:45 p.m. A follow-up appointment with Dr. Tingey was approved and scheduled for July 1, 2020, at 3:45 p.m.

The last entry in the medical records provided with the Report is for a nurse visit on July 2, 2020. Plaintiff complained of pain in his head and eyes and said he had not been receiving his pain medication. Nurse Harbes recorded his pain as 7 out of 10 and that Plaintiff said the Norco did help but Tylenol has not helped. APRN Yarnell prescribed Naproxen 500 mg for 14 days.

The Report asserts that Plaintiff's claim that Defendants Graham, Gannon, Freeman, Harrod, Jane Doe, and John Doe were deliberately indifferent to his serious medical needs is unsubstantiated.

**III. Discussion**

The Report argues that Plaintiff has not exhausted his administrative remedies with respect

7

to the subject matter of the claims he makes in the AC.  An inmate is required by the Prison Litigation Reform Act ("PLRA") to exhaust all available prison administrative remedies before filing a complaint in federal court.  Section 1997e(a) expressly provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a); *see also Little v. Jones*, 607 F.3d 1245, 1249 (10th Cir. 2010) (stating that under the PLRA "a prisoner must exhaust his administrative remedies prior to filing a lawsuit regarding prison conditions in federal court") (citations omitted).  "Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case."  *Porter v. Nussle*, 534 U.S. 516, 524–25 (2002) (citation omitted); *see also Jones v. Bock*, 549 U.S. 199, 219 (2007) (stating that "the benefits of exhaustion include allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record") (citations omitted).

This exhaustion requirement "is mandatory, and the district court [is] not authorized to dispense with it."  *Beaudry v. Corrections Corp. of Am.*, 331 F.3d 1164, 1167 n. 5 (10th Cir. 2003), *cert. denied*, 540 U.S. 1118 (2004); *Little*, 607 F.3d at 1249; *Gray v. Sorrels*, 818 F. App'x 787, 789 (10th Cir. 2020) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." (quoting *Jones*, 549 U.S. at 211)).  An inmate exhausts by complying with "an agency's deadlines and other critical procedural rules."  *Id.* (quoting *Woodford v. Ngo*, 548 U.S. 81, 90 (2006)).  A prison or prison system's regulations define the steps a prisoner must take to properly exhaust administrative remedies and a prisoner "may

8

only exhaust by properly following all of the steps laid out" therein. *Little*, 607 F.3d at 1249 (citing *Woodford*, 548 U.S. at 90). "An inmate who begins the grievance process but does not complete it is barred from pursuing a § 1983 claim under [the] PLRA for failure to exhaust his administrative remedies." *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002) (citation omitted). "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218.

In a suit governed by the PLRA, failure to exhaust is an affirmative defense and the defendant has the burden of proof regarding exhaustion of administrative remedies. *Roberts v. Barreras*, 484 F.3d 1236, 1241 (10th Cir. 2007). The issue of Plaintiff's failure to exhaust his available administrative remedies before filing his lawsuit must be determined before reaching the merits of his lawsuit. *Little*, 607 F.3d at 1249 ("unexhausted claims cannot be brought in court") (citation omitted); *see also Jernigan*, 304 F.3d at 1032 (an inmate who does not complete the grievance process is barred from pursuing a §1983 claim).

For Kansas state prisoners, the administrative remedies require the inmate to seek an informal resolution with personnel who work with the inmate on a daily basis. K.A.R. § 44–15–101(b). If the informal resolution is unsuccessful, the inmate must progress through a three-level process that includes submitting a grievance report form to (1) the appropriate unit team member, (2) the warden of the facility, and (3) the office of the secretary of corrections. K.A.R. § 44–15–101(d). The procedure to follow at each level is described in detail in Kan. Admin. Regs. § 44–15–102; *see also Garza v. Correct Care Solutions*, 2011 WL 2580299, at *2 (D. Kan. 2011), *aff'd* 451 F. App'x 775 (10th Cir.) (granting summary judgment for failure to exhaust claims against

Correct Care Solutions where plaintiff failed to allege that he sought relief on his claims first through his unit team, then the warden, and finally from the Secretary of Corrections).

Based on the Report, it is unclear whether Plaintiff exhausted his administrative remedies before filing this action. Plaintiff submitted a grievance to his Unit Team on July 14, 2020. Doc. 22-1, at 12. He then forwarded the form to the warden on July 27, 2020, apparently after the unit team failed to respond. There is no indication that he received a response from the warden within the time allotted. Then, it appears he may have submitted his grievance to the Secretary. While the Report states that Plaintiff failed to exhaust, the Court cannot determine from the documentation submitted whether that assertion is correct.

However, the Report does not support Plaintiff's claims in Count I. There is no indication that the defendants had actual knowledge that Inmate Austin posed a serious risk to Plaintiff and disregarded that knowledge. *See Farmer v. Brennan*, 511 U.S. 825, 838 (1994). The mere fact that an assault occurred does not establish the requisite deliberate indifference to Plaintiff's constitutional rights. *Hovater v. Robinson*, 1 F.3d 1063, 1068 (10th Cir. 1993).

There is also no support in the Report for Plaintiff's claims in Count II. There is no indication that Austin even possessed or used a padlock to attack Plaintiff. More importantly, there is no indication that Flores knew that Austin was hiding something in his mattress, let alone what he was hiding, that he was planning to use the item to attack Plaintiff, or even that there was a serious risk he would do so.

Finally, the Report and attached medical records do not demonstrate deliberate indifference on the part of the medical providers at EDCF. Plaintiff's claims that Graham failed to conduct an adequate examination of him after the assault and that he was put in an isolated cell and ignored are contradicted by the records. Graham documented her examination and findings in detail.

Plaintiff was given multiple ice packs and ibuprofen to attempt to address his pain. When Dr. Harrod learned the next day that Plaintiff had experienced nausea, he ordered that Plaintiff be taken to the hospital for further evaluation. Further, while Plaintiff may not have received the exact medication prescribed by the doctor at the hospital, Plaintiff instead received comparable medications that were available at EDCF. A mere difference of opinion between the inmate and prison medical personnel regarding diagnosis or reasonable treatment does not constitute cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 106-07 (1976); *Handy v. Price*, 996 F.2d 1064, 1067 (10th Cir. 1993) (affirming that a quarrel between a prison inmate and the doctor as to the appropriate treatment for hepatitis did not successfully raise an Eighth Amendment claim); *Ledoux v. Davies*, 961 F.2d 1536 (10th Cir. 1992) (Plaintiff's contention that he was denied treatment by a specialist is insufficient to establish a constitutional violation.); *El'Amin v. Pearce*, 750 F.2d 829, 833 (10th Cir. 1984) (A mere difference of opinion over the adequacy of medical treatment received cannot provide the basis for an Eighth Amendment claim.). The medical records indicate that Plaintiff was repeatedly monitored and assessed by EDCF medical staff and that his requests were accommodated. Where the complaint alleges a "series of sick calls, examinations, diagnoses, and medication," it "cannot be said there was a 'deliberate indifference' to the prisoner's complaints." *Smart v. Villar*, 547 F.2d 112, 114 (10th Cir. 1976).

## IV. Conclusion

In light of the *Martinez* Report and on further review of the Amended Complaint, the Court is considering dismissal of this matter for failure to state a claim on which relief can be granted. Plaintiff will be given an opportunity to respond to the *Martinez* Report and to show good cause why dismissal should not be entered. Failure to respond by the Court's deadline may result in dismissal of this action without further notice.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiff is granted until **May 25, 2023,** in which to respond to the *Martinez* Report and to show good cause why this action should not be dismissed for failure to state a claim.

**IT IS SO ORDERED**.

**Dated April 25, 2023, in Kansas City, Kansas.**

<u>S/ John W. Lungstrum</u>
**JOHN W. LUNGSTRUM**
**UNITED STATES DISTRICT JUDGE**