IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DAMIAN M. BATEAST
PLAINTIFF

VS.                                      CASE NO. 22-3093-JWL

OLUWATOSIN S. ODUNSOLU et al.
DEFENDANTS

## PLAINTIFF'S ARGUMENT IN RESPONSE TO THE MARTINEZ REPORT

COMES NOW DAMIAN M. BATEAST PROSE PLAINTIFF filed this civil rights claim under 42 U.S.C. 1983 while confined at El Dorado Correctional Facility (EDCF) El Dorado Kansas. Plaintiff brings this action against EDCF employees. Defendants: OLUWATOSIN ODUNSOLU, LCI Unit Team; ADAM KNAPP, CCI Unit Team; MATT MARTIN Unit Team Manager; DANA FLORES, Corrections Officer; LATHROM ASPINALL, Corrections Officer; BRANDON GAINES, Corrections Officer; ORLANDO PEREZ, Corrections Officer; Rachelle Chatham, Nurse; Eric Foreman, Corrections Officer; COY GANNON, Corrections Officer; JANE DOE Nurse; JOHN DOE, Corrections Officer; JOHN DOE, Medical Provider;

ON September 6, 2022 the court entered a memorandum and order directing KDOC to prepare a "Martinez vs Aaron" report. The report has now been filed. On April 25, 2023 the court entered a memorandum and order to show cause granting plaintiff until May 25, 2023 in which to respond. In response plaintiff states the following:

1

I. PLANTIFF'S EXHAUSTION OF HIS ADMINISTRATIVE REMEDIES.

The Martinez Report alleges Plantiff did not exhaust his administrative remedies and failed to follow the grievance procedure. Within the report I applied Exhibit B pages 1 through 19. (One the contents of the grievance I filed. I reiterated the facts of the incident as it happened to me in this grievance. I followed the grievance procedure as stated in the Kansas administrative regulations K.A.R. 44-15-102 procedure and K.A.R. 44-15-101b time limit for filing grievances.) Exhibit B, I wrote form 9 to unit team informing them I wasn't safe. (Exhibit B page 4-5.) I also verbally informed unit team multiple times about being self-cell'd because I wasn't safe. This should satisfy the informal resolution requirement of the grievance procedure. (Exhibit B page 6-7) consist of a grievance receipt signed and dated by an Corrections officer Dietrich on 7-15-2020 stating he submitted my grievance to unit team. I received no response from unit team within the 10 calendar days allowed so I moved forward with step 2 in the grievance procedure K.A.R. 44-15-102(2)(b) complaint to the warden. My explanation to the warden for no signatures from unit team is spelled out in Exhibit B on page 19. (Exhibit B page 6-7) consist of a grievance receipt signed and dated by Corrections officer Oliveda on 7-27-2020 stating he submitted my grievance to unit team to be forwarded to the warden. I received no response from the warden within the 10 working days allowed so I moved forward with step 3 in the grievance procedure K.A.R. 44-15-102(3)(c) appeal to the Secretary of Corrections. Since I received no response from unit team or the warden I had nothing to appeal so I wrote a letter to the secretary with my explanation why. (Exhibit B page 2-3). This resulted in a letter from Doug Burris Exhibit B page 1. In accordance with K.A.R. 44-15-102(c)(4), my grievance was forwarded back to the warden for response and even though I did receive my grievance from unit team I still did not receive a response from either unit team or the warden.

It is obvious I followed Prop. 44.15.101 and Prop. 44.15.102 grievance procedure to the best of my ability and tried to grieve my issue with prison officials. The receipts signed by corrections officers stating they submitted my grievance and Knapp stating he would submit my grievance to the Warden are proof of my attempts to exhaust my administrative remedies. I ask the court to consider my efforts to exhaust and not dismiss for failure to exhaust.

## II

IN COUNT 1, the plantiff claim defendants violated my eighth amendment right by being deliberately indifferent to my need for safety by failing to provide proper protection from inmate assault while in protective custody.

The report declares I frequently asked defendants Knapp and Ohnsoul to be single celled but doesn't state why. I asked to be single celled constantly because I wasn't safe and wanted to avoid violence from other inmates. Both defendants state restrictive housing unit A-2 didn't have enough room to provide every inmate their own cell. I am one individual in RHU on P.C. to escape violence from other inmates in RHU and needed to be single celled. I had a legitimate reason for making this request. Their declaration I frequently asked proves they were aware of and had knowledge of the serious risk of harm I faced. They both witnessed the constant altercations I was enduring with cellmates and the continual moves I had to make because of those altercations. They failed to act reasonably and their logic is that my life was placed in danger to preserve bed space on inconsequential logistical concern that was no more than a matter of convenience. This alone makes the defendants liable and deliberately indifferent to my need for safety.

Defendant Knapp and Ohnsoul stated in the report I and inmate Austin never expressed any fear of being celled together. Again I expressed my concerns to them constantly about being single celled to avoid violence from other inmates. There wasn't a inmate they assigned to be my cellmate that I did not endure violence or the threat thereof.

3.

They both knew I wasn't safe and they disregarded this known fact needlessly. I would like to emphasize to the court that the attack against me by inmate Austin was unprovoked.

The report doesn't address the fact that defendant Counsell exposed my P.C. status to the entire cellhouse in a forced attempt to get me to sign a P.C. waiver which made me a target amongst all inmates and caused me irreparable harm. I endured constant conflict while in A&U which labeled me a snitch because of my P.C. status. No one wants to be cellmates with a known snitch. I suffered unprovoked violence and threats of violence from inmates in A&U because of Counsell's exposure of my status. His actions contributed to the serious risk of harm I faced. My P.C. status was confidential and should have stayed that way. I ask the court not to dismiss my claim but to allow me the opportunity to prove it which will take discovery to obtain evidence.

Defendant Knapp states KDOC records showed no reason I and Austin could not be housed together. KDOC internal management policy and procedure #20-104A Exhibit (2) and internal management policy and procedure #20-106D Exhibit (3) contradict Knapp's statement. These (IMPP's) were issued after the attack that brought about my claims. Internal management policy and procedure #20-104 Exhibit (3) dated before the attack. I will be using these IMPP's in support of my argument. IMPP #20-104A states administrative restrictive housing is a form of restrictive housing used for residents who pose a threat to life, property, self, staff, or other residents or when a resident's continued presence threatens the secure and orderly operation of the facility. Prison officials classified inmate Austin as an (OSR) inmate and placed him in long term restrictive housing because they considered him a threat to prison population. This should have been a reason for us not to be celled together. We were of a different classification. I was in A&U on protective custody.

4.

IMPP #20-104D (exhibit H) states protective custody is housing in restrictive housing or modified operational units for residents needing protection from others until re-integration into general population environment is facilitated. It also states each facility must operate a protective custody program as an adjunct to the facilities administrative restrictive housing unit. I was suppose to be seperated from inmates in AHU for purposes other than protective custody. Their decison to assign a inmate prison officials classified as a threat to prison population because of his violent and disruptive behavior as a cellmate with a inmate who classification is P.C. and in protective custody to escape inmates of a violent nature was reckless and a total disregard for my safety. It was defendants job as unit team counselors in A-2 cellhouse to review inmate case files and assign cells. IMPP #11-101A decision making: Facility case management (Exhibit I) states that unit team counselors must provide case management to all offenders which include developing a recidivism reduction case plan, and managing custody and class-ification issues. Defendants neglected the fact that Austins case file showed him to be an OSM inmate, who is gang affiliated and well known for his violence. When they assigned him as my cellmate, they ignored the fact that I was in protective custody to avoid violence and to be safe and protected. Defendants practice of mixing inmates of different classifications created a hostile environment. The decision to assign Austin as my cellmate makes the liable and deliberately indifferent to my need for safety.

    Knapp states in his declaration he has no clear memory of any conversation with Austin on the day of the attack. He denies he was aware of or even condoned the unprovoked attack against me when he stated to Austin in order for him to be released from AHU an event had to happen. He states since the assault on me by Austin did not result in his release from AHU unit he was released from prison. The statement he created from the argument is without any basis of fact. Just because Austin was not released from AHU doesn't mean Knapp did not make this comment.

At this time I would like to establish motive for Knapp's repeated condoning of violence against me by other inmates also Counsell's exposure of my PC status to the entire A-2 cellhouse. I have reason to believe their retaliatory decisions derived from a grievance I filed with Unit team supervisor Counsell and EDCF warden Sam Cline detailing a incident where guards did contaminate my milk with bodily fluids (exhibit) grievance CA21519. I have reason to believe because of the substance I found in my milk I was made a target by prison officials. I was in a cell alone when this incident took place but from the filing of my grievance forward I was not allowed to be self-celled. Defendants would constantly assign me cellmates who would enter the cell and threaten me with violence. These inmates were of a different classification and in AHU for their violent and disruptive behaviors. I endured these threats of violence repeatedly because defendants would refuse to move me on the threat itself. I have reason to believe defendants placed me in these situations not to preserve bed space but in order for prison officials to get access to my property for search to try and deter the substance mentioned in my grievance to avoid exposure of their sadistic and malicious practice of contaminating my food. Defendants would refuse to move me even though I would complain of violence or the threat thereof. I would have to endure altercations or go on suicide watch which would give officials the access to my property. The assault by Austin which sent me to the hospital was also a ploy by officials which gave them access to my property. Defendants reason for assigning Austin as my cellmate and continuing his attack against me, Counsell's exposure of my PC status only contributed to the risk of harm I faced by labeling me a snitch among all inmates which only helped their cause. Given the totality of circumstances defendants Knapp and Counsell were aware of the excessive risk of harm I faced, contributed to that risk, and disregarded that risk which makes them liable and deliberately indifferent to my need for safety by failing to provide proper protection while in protective custody.

6.

The report states in defendants Nutci Martin's declaration under penalty of perjury that she had no interaction with me on or around June 26, 2020 the day of the unprovoked attack because she was unit team manager of the mental health unit which was in C-cellhouse. While I resided in A-cellhouse. She declares under penalty of perjury that I was not a resident on her caseload and she had no management duties with me during the relevant time of my allegations. (Exhibit H). KDOC administrative segregation monthly reviews dated 5-22-2020 through 8-7-2020 state that Martin was in fact UTM over A-cellhouse and I was apart of her caseload. (Exhibit V). On 6-19-2020 Martin's management duties at this time pertained to classifications where she detained me in AHU on P.C. status only 7 days before the unprovoked attack on me by Austin. (Exhibit V pg 20 #4) These KDOC administrative segregation reviews contradict Martin's declaration. I ask the court not to terminate Nutci Martin as a defendant in this case and not to dismiss my claim of cruel and unusual punishment for failure to provide proper protection from inmate assault while in protective custody.

III COUNT II, the plaintiff claim defendants were deliberate indifferent to my need for safety and violated my eighth admendment right.

The report states that there is no evidence that inmate Austin used a lock can and weapon in his attack against me. Defendants Flores and Lathrom in their declaration state they have no memory of moving me and Austin to a new cell in A-2. They also deny having any knowledge of a lock being concealed in Austin's mattress. As I stated in my amended complaint as my cause of action: Defendant refused to let Austin bring his mattress from cell #211 during the move and stated they would provide us with new mattresses when we reached cell #123 which they did. Austin was adamant about receiving his previous mattress. I called Flores to the door and whispered something to her.

7.

She left and both defendants returned with the previous mattress after they had denied his request multiple times. I further like to emphasize the point that there was no legitimate reason for the defendants to provide Austin with his previous mattress that concealed the lock after they had already provided us with new ones. This was a well known and established that Glawood were not to provide inmates with extra mattresses unless approved by a medical doctor the Warden which was not the case in this incident. IMPP# 12-129D Security and control of bedding and linen supplies JA states residents are to be issued one mattress. (Exhibit W page 5) Even though I did not hear what Austin whispered to Flores to establish that she knew the mattress concealed the lock used I can prove that their conversation revealed something relevant enough that she and Cathorn would violate KDOC policy which lead to the weapon being used in the assault against me by Austin. This isn't the only incident where Flores provided an inmate with his property that had weapons used in an attack against me. I suffered significant injuries once again because of her actions. She also made the comment to me that no one will believe your story. I took this as a confession of her guilt and participation in the attack. I have reason to believe she and Cathorn were fully aware of what was to transpire and they intentionally assisted in the assault against me by Austin. By providing him the mattress that concealed the weapon used, they violated KDOC policy of security and control which indicates to me defendants knew that inmate in the wrong and their mental state was not in a good place, their actions were malicious and lead to me being injured in an unprovoked attack with a weapon they provided to Austin concealed in a mattress which makes them both liable and deliberate indifferent to my need for safety.

I would like to dispute exhibit J page 4 of the report concerning the movement record provided in Knapp's declaration. I am absolutely sure that I and Austin was moved by Flores and Cathorn from the morning of 10-26-2020 the day of the assault and not 10-25-2020 as those records stated. To dispute the credibility of these movement records I would

like to use exhibit V page 2 of the Administrative Segregation review sheet that states on 6-19-2020 my cell location was A-2 #123 when the record states I was in #211 on 6-15-2020 and wasn't moved to #123 until 6-25-2020. This is an example that these dates and moves may not be accurate and lends doubt to their credibility.

The report states Brandon Gaines had no involvement in any of the allegations in my complaint. I will agree with the reports account concerning defendant Gaines and request the court allow me to amend the complaint and terminate Brandon Gaines at the appropriate time.

I would like to request the court to allow me to amend the complaint at the appropriate time to add Mason Gaines as a defendant in count 2 in place of Brandon Gaines. Mason Gaines according to the report is the Corrections officer who was present along with defendant Perez the day of the assault. Mason Gaines committed the malicious act of handcuffing my hands behind my back for showers and held onto the middle chain of the cuffs which rendered me vulnerable and unable to move while my cellmate stabbed me with a lock. I have reason to believe his actions were done in blatant disregard for my safety. The first indication for my abandonment is the prolonged hold of the middle chain of the cuffs which left me immobile and helpless at the door when we both had to be cuffed before the door could be opened. Why wouldn't he allow me to move away from the door so Austin could be cuffed. My second indication was when I noticed the signals he and Austin shared to acknowledge what was about to happen. 3rd was the visit he paid me while in the infirmary on 6-27-2020. I was talking with BHP for the first time since the assault when Gaines walked up and asked "how my brain was functioning." I stated "all cylinders firing." He then stated "oh well that didn't last." which was an indicator to me that expected worst for me than the condition I was in.

9.

His comments only confirmed his actions of holding me by the cuffs at the door while Austin attacked me were deliberate and intentional. I ask the court not to dismiss my claim but to allow me the opportunity to amend the complaint and add Payton Gaines as a defendant and prove his actions assisted in the assault on me by Austin in blatant disregard for my safety.

Defendant Perez stated in his declaration he observed Austin use only his fist and foot to attack me. He also states no weapon of any type was recovered from our occupied the cell shared by me and Austin. I would like to emphasize to the court as I stated in count I of the complaint, after Gaines sprayed us with mace, Austin ceased his attack and walked to the door to be cuffed but stopped because he still had the lock in his hand. He then walked to his bunk and placed the lock in a hole in his mattress. He then went back to the door and Gaines cuffed him up. Both officers Gaines and Perez watched as this was going. This may be the reason the lock wasn't found because it was placed back into the mattress before we exited the cell. The officers who investigated the assault and searched the cell did not search the mattress on purpose. Ignored the fact that a lock was used. There was never a deposition taken of my account of the assault. The only time I was asked what happened was when the disciplinary officer visited me in the infirmary to serve me a disciplinary report DR. But when I gave him my account of the assault, I did not receive a DR. Officials failed to deep this incident isolated and I believe that's the reason it wasn't investigated properly. The only other way I see to prove my allegation of being attacked with a lock is through medical and expert testimony. I ask the court not to dismiss my claim but to allow me the opportunity to prove it.

10.

II. IN COUNT III, Plaintiff claims Defendant were deliberate indifferent to his serious medical needs.

1. The Plaintiff claim Defendant Michelle Graham failed to conduct an adequate examination of my serious symptoms and injuries which caused me to suffer in substantial pain. The Defendant states medical records from June 26, 2020 do not substantiate my claims. Medical records show I was assessed by Nurse Graham at 10:52 pm. I strongly refute the contents of the assessment. Nurse Graham conducted no such assessment of my symptoms or injuries on 6-26-2020 while in the examination room. She never took my vitals, measured the knot above my eye, or examined my eye. She never asked me about my pain, question me about my injuries or the dizziness I was displaying. I didn't receive an ice pack until 6-27-2020. If she conducted so thorough of an examination then why wasn't I referred to see a provider. My symptoms and injuries warranted immediate medical attention and I was provided none. (MPP #10-145 (d)(c) Exhibit X). As stated in the complaint, Nurse Graham only cleaned the blood from the wound on my elbow. This was brought to her attention by one of the officers in the room with us. I was then taken to the infirmary to a suicide cell where I suffered in isolation without the help of a qualified medical provider. The officers who brought me to the clinic to be examined can witness to my argument because they tried to were shown but need witnesses to her neglect and their account of what happene in the examination room is crucial. Unfortunately I am unable to question them myself to obtain affidavits. I suffered substantially because Graham failed to inquire into the essential facts necessary to make a professional judgement and in doing so failed to conduct an adequate examination which prolonged my pain and suffering. I ask the court not to dismiss my claim but allow me the opportunity to prove it.

11

Plaintiff claims Defendants denied him access to medical personnel qualified to exercise judgement about his serious symptoms and injuries which delayed his access to treatment.

I was assigned to a suicide cell once in the infirmary and not a designated hospital room as stated in IMPP #10.114 policy statement. I was only provided a mattress and a blanket. The suicide cell had no emergency call button which forced me to beat on the windows to get the nurse and officer's attention because the cell was located at the far end of the building. I repeatedly went through this debilitating process to inform Jane Doe and John Doe of the extreme dizziness, vomitting of blood, headache and eye pain I was experiencing. I was unable to rest because of my pain and everytime I laid down the room would begin to spin causing me to vomit more. It is even mentioned in the medical records that the nurse on duty witnessed splatters of blood in the toilet that I showed her after vomitting. This should have been enough for her to consult with an physician who could have made a judgement call and gave her proper orders to address my symptoms and injuries. I asked defendants multiple times to see a doctor or someone who could help me but their response was there was nothing that they could do. This phrase spoke of their mental state which makes me believe no one was informed of my situation as to keep it an isolated incident. I suffered substantial pain and mental anguish through the night because they refused to follow procedure. Nurse Leider and Dr. Harrod thought my symptoms and injuries serious enough to warrant a hospital visit the next day, which means they considered my condition an emergency. If Jane Doe and John Doe had followed procedure and consulted with an physician my condition would have been properly assessed then my suffering would have been alleviated the day of the assault. [IMPP #10.114 DL13 Exhibit X]. Defendants refused to consult with an physician to inquire about my condition. Their negligence denied me access to medical personnel qualified to exercise judgement about my symptoms and injuries which delayed my access

12.

to treatment that caused me to suffer unnecessary pain through the night. Nurse Jane Doe and Corrections Officers John Doe were deliberate indifferent to my serious medical needs.

The report declares Defendant Cody Gannon had no involvement in any of the allegations in the complaint because he did not work at EDCF during the relevant time of the claim raised against him. I agree with the report's account concerning the defendant and request the court allow me at the appropriate time to amend the complaint to terminate this individual.

In place of Cody Gannon I ask the court to allow me to amend the complaint at the appropriate time to add a Alexander C. Gannon. Alexander C. Gannon was the transport officer on duty along with Defendant Eric Freeman who transported plaintiff to the off-site hospital in Eldorado, KS. on 6-27-2020. Defendants in sheer haste dashed me out of the hospital and forced me to ride back to EDCF with the I.V. used to draw blood still in my vein. Defendants demonstrated blatant disregard for my health and well being. When I reached EDCF's infirmary I informed Nurse Inslap who took my vitals. I showed her the I.V. in my vein and she scared to keep it in. I was placed back in the suicide cell with the I.V. still in my vein. This wasn't mentioned in her assessment comments provided in the report. I endured the discomfort of the I.V. thinking Nurse Inslap would come to remove it. She didn't. The DIC who was on duty came and informed me I was being moved to another room with a bed and a call button. I showed him the condition of the I.V. and told him I was removing it. I removed it and placed it in a paper bag and he disposed of it. Also I was moved to cell #111 the early morning of 6-28-2020 and not 6-29-2020 as the movement record states in exhibit 5 page 4, which lends more doubt to its credibility. I ask the court not to dismiss my claim but to allow me the opportunity to prove it which will take discovery to obtain necessary evidence.

13.

Plaintiff claims defendant ignored doctor's orders and this decision rendered plaintiff unable to receive pain medication prescribed by the doctor.

While at the hospital the doctor instructed me to not return to my cell but to remain in the infirmary, take my medication as prescribed, rest and heal. I was kicked out of the infirmary by Dan Hanna and sent back to A cellhouse without any pain medicine. The report stated my medical records revealed I was having issues or at times refusing the pain medication Hydrocodone. I dispute this account provided in my medical records. I never stated to anyone in the infirmary that the pain medicine the doctor prescribed at the hospital made me nauseous. I never refused to take my prescribed pain medication at any time while in the infirmary. These assessments are false. I was experiencing nausea before I started taking the pain medication which the record states I only took one at 9:30 a.m. on 6-28-2020. Why would I remain on nausea on the pain medication? If the pain medication prescribed by the doctor was the reason for my nausea why would Dr. Harrod prescribe medication for nausea after he issued a new order for Hydrocodone. I wouldn't be taking the pain medication at this point and wouldn't need medication for nausea. This was a scheme devised by medical staff to cover up the fact I never received any pain medication prescribed by the doctor at the hospital. I've included a patient medication report from Horizon dated 7-2-2020 (exhibit 7, pg 3) that list any and all prescribed medicine I was taking at that time. The list doesn't show any pain medication prescribed by Dr. Harrod on or before my visit to the hospital on 6-27-2020. This means I wasn't taking any pain medicine while in the infirmary. Dr. Harrod kicked me out of the infirmary without substituting or prescribing me any pain medicine at all. I suffered substantial pain because of my injuries and was unable to receive any pain relievers back at the cellhouse. I asked the dispensing nurse at med pass for my pain medication and she stated I didn't have an order for any pain meds. I informed her that I had went to the hospital for my injuries and the

14.

doctor prescribed me pain meds. I had no knowledge of what took place in the infirmary concerning the pain medication mentioned in the report. She stated that sometimes they don't allow those meds in the cellhouse because they are narcotics and have to be administered in the infirmary but she would check for me. I continued to ask for pain medication from the nurses to no avail so I submitted a sickcall request on 7-1-2020 about the pain I was experiencing and not receiving my pain medication. I was seen on 7-2-2020 (Exhibit Z). I was prescribed 500mg of Naproxen (Aleve) Yonell. I was continuing to experience severe pain after being prescribed the Naproxen so I submitted another sickcall request on 7-8-2020 where I came to the conclusion I still wasn't receiving any pain medication. Dr. Harrod showed no concern for my condition and because of his decision to nick me off the infirmary I suffered substantial pain from injuries unable to receive pain medication I was prescribed at the doctor. Dr. Harrod was inconsiderate and deliberately indifferent to my medical needs. I ask the court not to dismiss my claim.

15

## PLAINTIFF'S LEGAL ARGUMENT

IN RESPONSE TO PLAINTIFF'S EXHAUSTION OF HIS administrative remedies he cites: JONES v. BOCK 549 U.S. 199, 218, 127 S. Ct 910 (2007) COMPLIANCE WITH PRISON GRIEVANCE Procedures... IS all that is required for the PLRA to properly exhaust.

IN COUNT 1 the court cites: Farmer v. Brennan 511 U.S. 825, 838 (1994) STATING there is no indication that the defendants had active knowledge that inmate Austin posed a serious risk to plantiff and disregarded that knowledge. Earlier decisions holding that prison officials must know of a specific danger from an specific assailant are now overruled in Doe v. Norris 300 F.3d 487 (8th Cir. 2002) STATING prison officials could not escape liability just because he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault. The court cites Horten v. Robinson 1 F.3d 1063, 1068 (10th Cir. 1993) stating the mere fact that an assault occurred does not establish the requisite deliberate indifference to plantiff's constitutional rights. Plantiff being a inmate in protective custody to avoid violence from other inmates. Frequently asking defendants to be self-celled for this very purpose and being assigned a c/mate who was documented by prison officials to be a violent inmate and classified a threat to prison population should establish the requisite deliberate indifference to my constitutional rights. Little v. Walker 552 F.2d 193, 195-97 (7th Cir. 1977) placement of inmates needing protection in same unit with violent prone inmates supported an eighth amendment claim. Brown v. Budz 398 F.3d 904, 914-15 (7th Cir. 2005) holding deliberate indifference can be established by knowledge either of the inmates vulnerability or of an assailants predatory nature; both are not required. Adams v. Hunter 910 F.Supp. 620, 625-26 (M.D. Fla. 1995) acknowledging potential liability based on awareness of generalized, substantial risk of serious harm from inmate violence.

16.

Counsell's exposure of plaintiff's P.C. status to other inmates in a hall that labeled plaintiff a snitch and caused trepidation again. Benefield v. McDowall, 241 F.3d 1267, 1271 (10th Cir. 2001). It is clearly established in this circuit that labeling a prisoner as a snitch constitutes deliberate indifference.

In Count 2 Defendants Flores and Lathrom state in their declarations that inmates are allowed to bring their mattresses with them when moving from one cell to another. I ask then why would the French his request multiple times to receive his previous one then provide him a different mattress. Only after Austin and Flores shared their secret conversation did she change her stance. There was no legitimate reason to provide Austin with a second mattress which held the weapon and violate KDOC policy. Given their expertise and experience with inmates they both should have drawn the inference that inmates conceal contraband items in their mattresses. Their decision was wanton and assisted Austin in his unprovoked attack against me. Hicks v. State 84 A.D.2d 1050, 444 N.Y.S.2d 307, 309 (N.Y. App. Div. 1981) finding staff negligent where the assailant had walked past five officers and a civilian with a two and a half foot iron bar under his weapon apron. With adequate and proper supervision by correctional officers reasonably attentive to their duties the assault could have been prevented.

Perez and Mason Gaines comments prove that they both had knowledge of what transpired. Perez specifically admitted to me that everyone knew what was coming referring to the unprovoked attack by inmate Austin. He also stated that this wasn't Austin's first time doing that to someone. His statement was a confession of knowledge of the attack that wasn't addressed in the report. Perez and Mason Gaines could have intervened and prevented the attack but didn't making them both deliberately indifferent to my need

for safety. Velez v. Johnson, 395 F.3d 732, 736 (7th Cir. 2005). Officer knew of risk of assault could be liable for not acting.

In Count III Defendant Graham's documented examination did not take place as stated in the complaint. She only cleaned the blood from a wound on my elbow. She did not take my vitals or ask any questions concerning my injuries or symptoms in the exam room on 6-24-2020. Phillips v. Roane County, Tenn. 534 F.3d 531, 544 (6th Cir. 2008) (doctors who superficially performed examination in the face of nausea, vomiting and chest pain could evince deliberate indifference.) Miltier v. Beorn, 51 F.3d 714, 719 (7th Cir. 1995) and injury to the head was obviously sufficient serious and merit attention until properly diagnosed as to severity.

Defendants Jane Doe and John Doe threw plaintiff in a suicide cell in the infirmary at the rear end of the building. There was no emergency call button and I had to beat on the window to get their attention which was debilitating in my condition. They responded to my complaints of dizziness, vomiting of blood, head and eye pain with "there is nothing they could do". They refused to consult with a physician who could properly assess my symptoms and injuries therefore declining my access to medical treatment. I was not physically assessed until 6-27-2020. I suffered severe pain and intense mental anguish because of their neglect and failure to follow procedure. Defendants were deliberate indifferent to my serious medical need. Todaro v. Ward, 565 F.2d 48, 51-52 (2d Cir. 1977) (informed patients in isolation rooms must be provided a way to summon nurses. H.C. v. Hewett v. Jarrard, 786 F.2d 1080, 1083, 1087 (11th Cir. 1986) (isolation of injured inmate and deprived of medical attention for three days)

10

McGill v. Mountainside Police Dept. 720 F. Supp 418, 423 (D.N.J. 1989) Police officer's failure to get medical help for arrestee who was vomiting blood and had breathing difficulties. Monphile v. Howard 513 F.3d 714, 719 (7th Cir. 1995) (any injury to the head unless obviously superficial should be ordinarily considered serious and merits attention until properly diagnosed as no severe. Hughes v. Joliet Correctional Center 931 F.2d 425, 428 (7th Cir. 1991) (evidence that medical staff treated plantiff not as a patient but as a nuisance and were insufficiently interested in his health to even take minimal steps to guard against the possibility that the initial was severe could support a finding of deliberate indifference.

Eric Freeman and Alexander C. Gannon were the transport officers on 6-24-2020 who in their haste to be relieved of their duty rushed me out of the hospital with the I.V. used to draw blood still in my veins. Both officers showed no regard for my health or wellbeing. Gaines v. Choctaw County Commission 242 F. Supp 2d 1153 (D.S.D. Ala. 2003) (Sheriff's removal of prisoner from hospital against medical advice supported a deliberate indifferent claim. Hodge v. Ruperto 739 F. Supp 873, 879 (S.D.N.Y 1990) Police officers could be held liable for removing a arrestee from the hospital before his x-rays could be examined and his injuries treated)

Dr. Harrod's decision to kick me out of the infirmary lead to me not receiving any pain medication for my serious injuries. He knew of the diagnosis from the hospital and the medication I was prescribed. We even conversed about my injuries and the pain I was experiencing the day he made his decision to send me to the cellhouse. I was only administered effective pain medicine once during my stay in the infirmary which

19

proves the lack of concern medical staff had for my condition. Even when I was kicked out of the infirmary I was sent back to the cellhouse without being prescribed pain medication. I suffered substantial pain from my injuries because of Dr. Harrod's decision and lack of concern for my condition. Lavender v. Lampert 242 F.Supp 2d 821, 848 (D.Or. 2002) failure to provide continuous and effective pain relieving medication for prisoners known to have chronic pain.

Pursuant to 28 U.S.C. 1746. I declare under penalty of perjury that the foregoing is true and correct. Executed on 6·21·2023

Damian M. Bateast
Lansing Correctional Facility
P.O. Box 2
Lansing, Kansas
66043